WESTERN UNION TEL. CO. v. MYATT, State Solicitor, et al.

(Circuit Court, D. Kansas, First Division. November 27, 1899.)

1. STATES — POWER TO REGULATE PUBLIC-SERVICE CORPORATIONS — CONSTITUTIONAL LIMITATIONS.

The power of a state to control public-service corporations and the use of property devoted to public service by provisions for the safety and convenience of the public, and also by restrictions against unreasonable or extortionate charges and unjust discriminations, is well settled; but such power is subject to the constitutional limitations designed to protect owners of property against oppressive action by the state amounting to a deprivation of such owners of their property without compensation, or without due process of law, or to a denial of the equal protection of the laws.

2. CONSTITUTIONAL LAW — DIVISION OF POWERS — LEGISLATIVE AND JUDICIAL FUNCTIONS.

The exercise by a state, either by the legislature directly or by a subordinate board or body to which it has been delegated, of the power to

regulate the conduct of a business affected by a public interest, and to fix for future observance the rates and charges for services rendered therein, is wholly a legislative or administrative function; but, after such action has been taken, the determination of the question whether it transcends the powers of the state, as limited by constitutional provisions, is beyond the province of legislative jurisdiction, and involves the exercise of judicial functions. The two functions are essentially and vitally different, and the legislature cannot place its own enactments beyond the constitutional jurisdiction of the courts; nor, on the other hand, can courts fix rates, or determine whether one rate is preferable to another, but their power is limited to a determination of whether a rate fixed is violative of constitutional provisions, and, if so, to enjoining its enforcement.

**3. SAME—KANSAS COURT OF VISITATION.**

The court of visitation of Kansas, created by act of January 3, 1899 (Sp. Sess. Laws 1898, c. 28), and given by that act and by chapter 38 of the Laws of the same session general power to regulate the business of railroad and telegraph lines within the state,—among others, the power to classify freight, require the construction and maintenance of depots, regulate crossings and intersections of railroads and the operation of trains, require the use of improved appliances, to prescribe schedules of rates, and to have the same jurisdiction and control over the management of telegraph lines,—is, in the exercise of such powers, a legislative and administrative body; nor is its character as such affected by the fact that it is denominated a court, and provided with the machinery of one, or that it is empowered to conduct an investigation, under the forms of legal procedure, before taking action in such matters.

**4. SAME—POWER OF LEGISLATURE TO CREATE COURTS.**

Const. Kan. art. 3, § 1, which authorizes the legislature to create courts inferior to the supreme court, and by implication to define their jurisdiction, does not confer power to create courts for the exercise of legislative or administrative functions; and tribunals created under such power are courts only in respect to matters of a judicial nature, and such as are properly incidental thereto.

**5. SAME—UNITING LEGISLATIVE AND JUDICIAL POWERS IN SAME TRIBUNAL**

The provisions of the constitution of Kansas designating the separate departments in whom shall be vested, respectively, the executive, legislative, and judicial powers of the state, as construed by the supreme court of the state in harmony with the uniform construction given the similar provisions of the federal constitution, contemplate that each department shall be separate from and independent of the others, and forbid the uniting of such powers in the same officers or tribunal in respect of the same subject-matter; and, under such construction, the act creating the court of visitation, and attempting to vest it with power to make laws and regulations which clearly involve the exercise of legislative functions, and also to pass on the validity of such laws and regulations judicially, and to execute and enforce its own orders and judgments, cannot be sustained as constitutional.

**6. SAME—DUE PROCESS OF LAW—PROCEEDING BEFORE ILLEGAL TRIBUNAL.**

The act creating the court of visitation being invalid, at least in so far as it attempts to confer upon that body judicial powers in respect of the same matters of which it is given legislative and administrative jurisdiction, a proceeding before that court, in which it is sought to secure a judgment on the reasonableness of rates prescribed by it to be charged by a railroad or telegraph company, would not be due process of law within the meaning of the federal constitution.

**7. FEDERAL COURTS—INJUNCTIONS TO STAY PROCEEDINGS IN STATE COURT.**

Rev. St. § 720, prohibiting the granting of an injunction by a federal court to stay proceedings in any court of a state except in bankruptcy proceedings, does not apply where the proceedings sought to be stayed are before a body which is not legally a court, and the fact that it is denominated a court, and alleged to be one, does not preclude the federal

court from determining that question, where it has not been authoritatively determined by the courts of the state.[1]

**8. SAME—JURISDICTION—SUIT AGAINST STATE.**

A suit in a federal court by a telegraph company against the members of the court of visitation of Kansas and the state solicitor to enjoin proceedings by defendants to enforce compliance with a schedule of rates established by the state, and alleged by complainant to be invalid because in violation of its rights under the constitution of the United States, is not a suit against the state, within the meaning of the eleventh amendment of the federal constitution, the defendants not being general officers of the state, but officers expressly charged with the duty of enforcing railroad and telegraph regulations and rates under powers specially conferred upon them for that purpose.

**9. CONSTITUTIONAL LAW—STATUTE FIXING TELEGRAPH RATES—ENJOINING ENFORCEMENT.**

The legislature of Kansas having, by a statute (Sp. Sess. Laws 1898, c. 38), fixed a maximum rate on telegraph messages between points in the state, and charged the court of visitation of the state with the duty of enforcing such rate unless it should judicially determine it to be unreasonable, and it having been adjudged that such court is without judicial power to determine the reasonableness of such rate, a telegraph company, upon a showing that the rate so fixed is below the actual cost of the service, is entitled to an injunction restraining the enforcement of such rate on the ground that its enforcement would operate to deprive it of its property without due process of law, and would be a denial of the equal protection of the laws.

## On Application for Temporary Injunction.

The Western Union Telegraph Company is a corporation organized under the laws of the state of New York, and is a citizen of that state. The defendants are citizens and residents of the state of Kansas. Defendants W. A. Johnson, J. C. Postlethwaite, and L. C. Crum are the judges of the court of visitation, a tribunal organized pursuant to the provisions of chapter 28 of the Special Session Laws of 1898 of the state of Kansas, the same being an act entitled "An act creating a court of visitation, declaring its jurisdiction and powers, and providing for proceedings and procedure therein," approved January 3, 1899. A. J. Myatt is the state solicitor, whose office is created and whose duties are defined by the said act. The defendant J. G. Maxwell is the complaining witness in certain proceedings against the telegraph company pending in the court of visitation, and who, by such proceedings, is seeking to enforce the provisions of chapter 38 of said Special Session Laws, the same being an act entitled "An act concerning the transmission and delivery of telegraphic messages, regulating the charges therefor between points within this state, granting the court of visitation jurisdiction of certain matters mentioned herein and prescribing penalties for violations thereof," approved January 6, 1899. Said chapter 28, which creates the court of visitation, so far as it concerns this suit, is substantially as follows: Section 1 creates the court of visitation, denominates it a court of record, and prescribes the qualifications of the judges thereof. Section 2 provides for the election of the judges, and for their appointment pending such election. Section 5: The appointment and subsequent election of a state solicitor, and that "it shall be his duty to appear and represent the state in all actions and proceedings before the court of visitation to which the state is a party." Section 7: The court shall sit at its rooms in the state house, but for good cause may sit in any other place in the state, and shall be deemed in perpetual session. Section 8 defines the power and jurisdiction of the court throughout the state to try and determine all questions as to what are reasonable freight rates, switching and demurrage charges, and other charges connected with the transportation of property

---

[1] As to restraining proceedings in state courts, see note to Garner v. Bank, 16 C. C. A. 90, and, supplementary thereto, note to Central Trust Co. v. Grantham, 27 C. C. A. 575.

between points in the state; to apportion charges between connecting roads, determine all questions relating to charges for use of cars, etc.; to regulate charges for part car-load and mixed car-load lots of freight, etc.; to classify freight; to apportion transportation charges among connecting lines; to require the construction of depots, switches, etc., for public convenience; to compel reasonable and impartial train and car service; to regulate crossings and intersections of railroads and regulate the operation of trains over them; to prescribe rules concerning the movements of trains to secure safety to employés and the public; to require the use of improved appliances and methods to avoid accidents and injuries to persons; to restrict railroad corporations to operations within their charter powers, prevent the oppressive exercise thereof, and compel performance of all duties required of railroads by law; to summon juries, as a court of equity, in any case or matter before it, the qualifications of the jurors being prescribed; to exercise other and further powers as are given by the said act or as may be conferred by law. Section 9: The court shall possess full common-law and equity powers as to matters within its jurisdiction; may issue writs and process to compel attendance of parties and witnesses, the production of books, etc.; execute its decrees and orders, including writs of injunction and mandamus, and may appoint receivers to carry its judgments into effect; shall have the same power to punish for contempt as district courts. Section 13 provides that the pleadings shall be a complaint in the name of the state as plaintiff, to be styled an "information" and an "answer of defendant,". and prescribes what may be set forth therein. Section 14 makes it the duty of the state solicitor to file information in the name of the state upon receiving sworn information of violation of law on the part of any railroad company. Section 16 provides that the court may appoint a special state solicitor if the regular officer neglects or delays the performance of his duties, and for a forfeiture of the latter's compensation. Section 17: After the return of the citation, no information can be dismissed without the permission of the court, and no compromise, agreement, or stipulation between the state solicitor and any defendant shall be binding upon the court without its approval after being fully advised of the facts. Section 20: The complainant may employ counsel to assist the state solicitor in proceedings on behalf of the state, which additional counsel are to be treated by the state solicitor and the court equally with the state solicitor. Section 21: Any person, corporation, county, etc., interested in any information or complaint shall be made a party to the proceeding. Section 22: Any aggrieved person, corporation, etc., though not a party to the suit, may enter appearance therein at any time on showing that the decree of the court is being violated, and secure enforcement thereof. Section 24 authorizes the court to order the information to be amended so as to bring the entire schedule of rates of the railroad company before it for consideration, if it deems it probably unjust to merely change the rate between the points mentioned in the information. Section 28 provides for such decree at the conclusion of every trial as the pleadings and proofs warrant. After the trial of any action involving the reasonableness of a general schedule of freight charges, the court shall specially find the facts it deems most material, the value of the road and all property used in connection therewith, the actual cost, the amount of capital stock, the bonded and other indebtedness, what part is fictitious or fraudulent, if any, the average yearly revenue, the sources from whence derived, whether they will probably increase or diminish, the average expenses of operation and maintenance, etc. The court shall thereupon enter decree in accordance with its findings and decision, adjudging and decreeing what are reasonable rates for each and every service at issue in the case, and perpetually enjoining the defendant from demanding or receiving any other or different rates. The decree shall embody a complete schedule of the charges adjudged to be reasonable, and the classification of freight necessary for the explanation thereof. Section 29: The court may, as a court of chancery, rehear any order or decree. Section 30: Copies of each order or decree determining what are reasonable charges shall be printed by each railroad company affected, and posted in a place convenient for public use. Section 31: In certain cases, companies owning connecting lines must be joined as defendants, and the hearing and decree shall include the joint rates and apportionment thereof. Section 32: If any company fails to comply with

any order or decree for 30 days after promulgation thereof, the court, upon proof of such failure, and after notice, may order sequestration of the whole or any part of the company's property, owned or leased, and appoint a receiver to take possession and charge of the property, and operate the same, and carry the order and decree into effect, or until the company shall furnish satisfactory security for compliance, in which latter case the accounts of the receiver shall be passed, and the net proceeds of operating the property shall be paid to the company, and the property returned to it. Section 34: Final decrees of the court shall be reviewable by the supreme court in like manner as judgments of district courts. The supreme court may, in its discretion, stay the issuing of any writ or process to carry the decree into effect pending the appeal, but such stay shall not affect the use, conclusiveness, or exclusiveness of any such decree as evidence in any case or proceeding. The time within which the appeal may be taken is prescribed. Section 36: No proceeding to review any decree of the court shall preclude the opening of the same during the pendency of the appeal, but the court of visitation may at any time reconsider the matter, and take into consideration other circumstances not before considered in connection with evidence on which the former decision was based, and enter a new order or decree. Section 37 relates to fees and costs, and provides that the court may employ experts and extra stenographers when deemed necessary, and tax a reasonable allowance for their services as costs. Section 40: Any officer, agent, or employé of a railroad company shall be deemed guilty of a misdemeanor, and punished by fine, of not more than $1,000. or imprisonment in the county jail for not more than a year, if he shall knowingly demand, collect, or receive a greater compensation for the transportation of persons or property than that fixed by law or by the court, or who shall discriminate in the matter of rates and charges; and the railroad company itself is subject to a penalty of $1,000, and each day that such violation continues constitutes a separate and additional offense. It is made the duty of the state solicitor to prosecute such offenses, or to recover the penalties by civil action. Section 41 authorizes the recovery of damages by parties injured by the disobedience of any railroad company of the provisions of the act, or of any law of the state, or of any lawful order or decree of the court, together with costs and reasonable attorney's fees; and, if the disobedience is willful, exemplary damages may be awarded, not exceeding treble the amount of the actual damage. Section 42: Whenever it is made to appear that there is a strike by the employés, or part of them, of a railroad company, and that commerce or traffic is being obstructed, or the public inconvenienced, etc., the court shall issue a citation to the corporation requiring it to appear and make answer under oath as to the cause of the strike, its extent, etc., and the precise matter of dispute between it and the striking employés. Upon default of the company the court may make final decree as upon hearing. If answer is made, the matter is tried summarily. If the corporation is found blameless, the court so finds, and the proceedings are dismissed, and thereafter it is unlawful for the strikers to interfere with the other employés of the corporation. But, if the court finds that the corporation is at fault, it shall so find, and enter a decree commanding it to forthwith perform its usual functions as before the strike occurred; and, if the decree is not instantly obeyed in full and in good faith, the court may take charge of the property of the corporation, and operate it through receivers, whom it shall appoint, until the court is satisfied that the corporation is prepared to fully resume its functions. But if, pending the proceeding in court, the corporation shall have come to an agreement with its striking employés, and the court is satisfied that the corporation will abide by the terms of the agreement, then, and only in such case, the hearing of the proceeding may be postponed a reasonable time, or from time to time, while the employés who return remain at work, etc. Chapter 38, pertaining to telegraph companies, is, so far as concerns this suit, substantially as follows: Section 1: The court of visitation shall have the same power, jurisdiction, and control over all questions concerning the regulation of the telegraph service in this state, the reasonableness of charges herein fixed, or to be fixed by any order of said court, and in all matters concerning the regulation, management, or control of telegraph companies, as is conferred upon said court in reference to railroads or railroad corporations in this state; and the same duties are im-

posed with reference thereto upon the state solicitor. Section 2 prescribes a schedule of maximum rates; must not be in excess of 15 cents for the first 10 words (exclusive of address and one signature), and 1 cent for each additional word for transmitting any message between points in the state. Other limitations are made with reference to special reports for newspapers. Section 7 provides for the recovery of $100 and attorney's fees for each refusal to transmit or deliver any message after the tender of the rate fixed, in addition to actual damages sustained. Section 8 denominates a violation of any of the provisions of this act as a misdemeanor, and imposes a penalty of a fine of not less than $50 nor more than $500, and imprisonment in the county jail for not less than 30 days nor more than a year. It is unnecessary to set out the other sections of the act, as the above show the scope of the legislation in question.

The complainant alleges that for a long time it has been the owner and engaged in the operation of many miles of telegraph lines in the states and territories of the United States, and, in connection therewith, many miles of such lines in the state of Kansas; that it has established and maintains about 844 offices within this state for the transaction of its business; that the maximum telegraphic rates prescribed by said chapter 38 are materially less than the actual cost of the performance of the service; that 600 or more suits have been instituted against the complainant in the state courts for its refusal to transmit messages at the legislative rates; that defendant Maxwell tendered to complainant certain messages, and demanded the transmission thereof at said rates, and, upon refusal of the complainant to perform the service at such rates, Maxwell filed a complaint with A. J. Myatt, the state solicitor, and the latter filed an information thereon against the complainant in the court of visitation, caused citation to be issued and served upon it, and is proceeding to enforce the performance of the telegraphic service at the maximum rates prescribed. The complainant attacks the validity of said enactments of the legislature, and claims that the enforcement thereof would operate to deprive it of its property without due process of law, and as a denial of the equal protection of the laws; and this suit is brought to enjoin further proceedings for the enforcement of the maximum rates complained of, and to have the same adjudged unreasonable and void, etc. The cause now arises on an application of complainant for a temporary injunction. The proofs on such application clearly show that the rates prescribed by the law are not only not compensatory, but are materially less than the actual cost of the service. It is not denied by defendants that sufficient proof has been made by complainant in this respect.

George H. Fearons, Rossington, Smith & Histed, L. C. Krauthoff, and Frank Hagerman, for complainant.

A. J. Myatt, State Sol., and A. A. Godard, Atty. Gen., for defendants.

HOOK, District Judge (after stating the facts). The act of the legislature creating the court of visitation and defining its jurisdiction and powers, and the act fixing the maximum rates for telegraphic service, and conferring jurisdiction respecting telegraph companies upon the court of visitation, are parts of the same general body of legislation affecting public-service corporations that was enacted at the special session of the Kansas legislature of 1898. They are, therefore, to be construed together; and, even were this not the case, the latter enactment is, by its terms, dependent upon the act creating the court of visitation. There are certain principles involved in the consideration of the questions arising in this case which have been so clearly and definitely settled that it is unnecessary to review the various decisions of the courts supporting them. They relate to the nature and extent of public control over property affected with a pub-

lic interest, and the character and limitations of the functions employed in and about the exercise of such control. Whenever special privileges, not generally possessed by private persons, are conferred by law upon corporations to enable them to carry out the objects of their organization, and their business and source of profit consists wholly or partly in the service and patronage of the public, their property dedicated to such employment becomes clothed with a public interest, and to the extent of such interest it is subject to public control. The doctrine of governmental control of property and employments devoted to public use is particularly applicable to what are commonly termed "public-service corporations,"—such as railway and telegraph companies,—although it is also applied, though probably in a much more modified degree, to the property of private persons, which, by reason of its use, has ceased to be juris privati. So long as property is so employed, the power of control by the public through their proper representatives exists; and such control may embrace not only provisions for the safety, security, and convenience of the public, but also restrictions against unreasonable or extortionate charges and unjust discriminations. This power of control, however, is not absolute, but is subject to certain constitutional limitations, designed for the protection of the owner against oppressive action on the part of the state amounting to a deprivation of his property without compensation, or without due process of law, or amounting to a denial of the equal protection of the laws.

The exercise by the state of the power to regulate the conduct of a business affected with a public interest, and to fix and determine, as a rule for future observance, the rates and charges for services rendered, is wholly a legislative or administrative function. The legislature may, in the first instance, prescribe such regulations, and fix definitely the tariff of rates and charges; or it may lawfully delegate the exercise of such powers, and frequently does, in matters of detail, to some administrative board or body of its own creation. The establishment of warehouse commissions, boards of railroad commissioners, and the powers usually committed to them, are familiar instances of the delegation of such powers. But by whatever name such boards or bodies may be called, or by what authority they may be established or created, or however they may proceed in the performance of their duties, they are, in respect of the exercise of the powers mentioned, engaged in the exercise of legislative or administrative functions as important in their character as any that are committed to the legislative branch of the government on the subject of property and property rights. In prescribing regulations or rules of action under the police power of the state for the safety and convenience of the public, or in determining a schedule of rates and charges for services to be rendered, they are in no sense performing judicial functions, nor are they in any respect judicial tribunals. The distinction between legislative and judicial functions is a vital one, and it is not subject to alteration or change, either by legislative act or by judicial decree, for such distinction inheres in the constitution itself, and is as much a part of it as though it were definitely defined therein. When the legislature has once acted, either by

itself or through some supplemental and subordinate board or body, and has prescribed a tariff of rates and charges, then whether its action is violative of some constitutional safeguard or limitation is a judicial question, the determination of which involves the exercise of judicial functions. The question is then beyond the province of legislative jurisdiction. As applied to this case, the power of the state to fix or limit the charges of telegraph companies for the transmission and delivery of telegraphic messages is a legislative one, but whether the rates so fixed or limited are unreasonable to the extent that the enforcement of their observance would amount to a deprivation of the complainant of its property without due process of law and a denial of the equal protection of the laws, and therefore violative of the first section of the fourteenth amendment to the constitution, is a question for the courts. Whatever deprives an owner of the beneficial use of property lawfully acquired and held, or denies him a reasonable compensation for such use, in effect deprives him of the property itself; for, generally speaking, the chief value of property lies in the use and employment thereof; and to require of an owner or class of owners the use of their property for public benefit without reasonable compensation, while others are not subjected to such restriction, is a denial of that equal protection of the laws which is one of the safeguards of the constitution. Concisely stated, to prescribe a tariff of rates and charges is a legislative function; to determine whether existing or prescribed rates and charges are unreasonable is a judicial function. That this is the settled doctrine in this country is no longer open to question. It is firmly fixed in the body of our jurisprudence. Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. It follows, therefore, as a corollary of this doctrine, that courts have no power to prescribe a schedule of rates and charges for persons engaged in a public or quasi public service, because that is a legislative prerogative, and that the legislature has no power to forestall the judgment of the courts by declaring that a tariff or schedule prescribed by it is a finality, and thus prevent an inquiry into the reasonableness thereof by the courts in a controversy properly challenging such reasonableness. The legislative prerogative is the power to make the law, to prescribe the regulation or rule of action. The jurisdiction of the courts is to construe and apply the law or regulation after it is made. The two functions are essentially and vitally different.

In Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970, the legislative act authorized a railroad and warehouse commission to compel common carriers to adopt such rates and charges as the commission "shall declare to be equal and reasonable." The supreme court of the state held that the finding of the commission was final and conclusive, and that the law neither contemplated nor allowed an issue to be made, nor an inquiry to be had, as to their equality and reasonableness in fact. The supreme court of the United States held that, if this were the correct interpretation, and the decision of the state court was conclusive upon that point, the law conflicted with the constitution of the United States,

because it "deprived the company of its right to a judicial investigation under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy, and substituted therefor, as an absolute finality, the action of a railroad commission, which, in view of the powers conceded to it by the state court, could not be regarded as clothed with judicial functions, or possessing the machinery of a court of justice." This decision illustrates to some extent the limit of the power of the legislature in respect of such matters. It cannot place its own enactments beyond the constitutional jurisdiction of the courts. On the other hand, as to the province of the courts, it was said in Reagan v. Trust Co., 154 U. S. 362, 397, 14 Sup. Ct. 1047, 1054, 38 L. Ed. 1014, 1023:

"The courts are not authorized to revise or change the body of rates imposed by a legislature or a commission. They do not determine whether one rate is preferable to another, or what, under all circumstances, would be fair and reasonable as between the carriers and the shippers. They do not engage in any mere administrative work. But still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation."

In Railway Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, it was also said that "it is not the province of courts to enter upon the merely administrative duty of framing a tariff of rates for carriage."

In referring to the question whether rates established by the legislature prevent a fair and reasonable return for the employment of capital in a legitimate enterprise, it was said by Foster, J., in Cotting v. Stock-Yards Co. (C. C.) 82 Fed. 845:

"It should not be assumed that courts, in deciding this constitutional question, can undertake to fix rates, but merely to decide whether the rates prescribed by the law are in violation of the complainants'. constitutional rights."

Judge Thayer, in the same case, said that "the judiciary have no power to prescribe a schedule of maximum rates." (C. C.) 82 Fed. 856.

In the Express Cases, 117 U. S. 1, 29, 6 Sup. Ct. 628, 29 L. Ed. 791, 803, the court, in speaking of the action of the trial court in fixing and regulating the terms upon which the railroad company and the express company should do business, said:

"In this way, as it seems to us, the court has made an arrangement for the business intercourse of these companies, such as, in its opinion, they ought to have made for themselves. * * * The regulation of matters of this kind is legislative in its character, not judicial. To what extent it must come, if it comes at all, from congress, and to what extent it may come from the states, are questions we do not now undertake to decide; but that it must come, when it does come, from some source of legislative power, we do not doubt."

In Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 682, 4 Sup. Ct. 192, 28 L. Ed. 297, the court said:

"A court of chancery is not, any more than is a court of law, clothed with legislative power. It may enforce, in its own appropriate way, the specific performance of an existing legal obligation arising out of contract, law, or usage, but it cannot create the obligation."

In Railway Co. v. Wellman, 143 U. S. 339, 344, 12 Sup. Ct. 400, 402, 36 L. Ed. 176, 179, the court said that "the legislature has power to

fix rates, and the extent of judicial interference is protection against unreasonable rates."

In Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U. S. 499, 17 Sup. Ct. 900, 42 L. Ed. 243, Mr. Justice Brewer, in delivering the opinion of the court, said:

"It is one thing to inquire whether the rates which have been charged and collected are reasonable,—that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future,—that is a legislative act."

The foregoing will serve to illustrate sufficiently the line of demarkation between legislative and judicial functions as respects the subject-matter under consideration. The power to regulate and to limit the charges of those engaged in occupations clothed with a public interest belongs to the state, and is exercised through the legislature, either directly or mediately; but that power is not a power to destroy. Its authority stops at injustice, and under the right to prescribe rates of service it cannot require a corporation or individual engaged in a legitimate enterprise to yield to the alternative of abandoning the occupation, and the lawful employment of property therein, or continuing the same without reasonable and just compensation; and, where this is threatened, the jurisdiction of the courts may be invoked.

What, then, is the nature of the powers conferred upon the court of visitation? It is apparent from even a cursory examination of those parts of the act of the legislature which define the primary powers and jurisdiction of that body that they are largely of a legislative or administrative character, and such as do not pertain to the functions of a court. It is difficult to define the precise difference between those that are legislative and those that are administrative. It is unnecessary, however, to do so in this case, for it is immaterial whether the powers of that court, so called, aside from those that are judicial, are of the one character or of the other, or are a blending of both. A court does not (to use the language of the act) "classify freight," nor "require the construction and maintenance of depots, switches, side tracks, stock yards, cars, and other facilities for the public convenience," nor "regulate crossings and intersections of railroads," nor "regulate the operation of trains" over such crossings and intersections, nor "prescribe rules concerning the movements of trains to secure the safety of employés and the public," nor "require the use of improved appliances and methods to avoid accidents and injuries to persons," nor "apportion transportation charges among connecting carriers," nor "regulate charges for part car-load and mixed car-load lots of freight, including live stock," nor prescribe what rates of transportation of freight and passengers shall be charged. The regulation of such matters is legislative in its character, not judicial. The Express Cases, supra. Of course, courts of chancery, in the exercise of their equity jurisdiction, may, and frequently do, through the medium of receivers, appointed by them, exercise some of such powers in the administration of property which is the subject-matter of litigation in such courts, and especially where, in order to preserve the value of such property while it is in the possession of the court,—

is necessary to continue the operation thereof, and maintain it as a going concern. But it is not in such sense that these powers were conferred upon the court of visitation. Courts also have the undoubted power to determine some of these matters, if they properly lie in the road to the ultimate adjudication of other existing controversies concerning which the jurisdiction of the court has been invoked; as, by way of illustration, where, in litigation over the destruction of life or property in a railroad accident, it becomes material to ascertain whether the company used proper appliances and methods to avoid such an occurrence. Nor is it to this end that the powers mentioned were conferred upon the court of visitation. The exercise of the powers granted contemplates the prescribing of rules and regulations for future guidance, and the possession of such powers by the court of visitation makes it one of the potential agencies of the legislative department of the state. To use the expression of a learned justice of the supreme court, the court of visitation, in respect of such functions, is "an active, seeking, supervising body; the eye and the activity of the state." As to such powers and duties the court of visitation is not, and cannot be, a court. Practically all of the powers then possessed by the board of railroad commissioners of Kansas, which was purely an administrative body, were conferred upon the court of visitation, and as an evidence of the legislative purpose and intent the then existing laws relating to the appointment, powers, and duties of the board of railroad commissioners were, by act of the legislature, repealed a few days after the passage of the act creating the court of visitation. Both acts were passed at the same legislative session; the latter, by its terms, taking effect March 15, 1899, and the repealing act, by its terms, taking effect the first Monday of April of the same year.

It was argued at the bar on behalf of the defendants that the powers conferred upon the court of visitation are judicial in their character, for the reason that the law contemplates an investigation and consideration on the part of the court before final action is had; and it is particularly recalled that such contention was made with reference to paragraphs 8 and 9 of section 8 of the act, which authorize the court of visitation to "prescribe rules concerning the movements of trains to secure the safety of employés and the public, and to require the use of improved appliances and methods to avoid accidents and injuries to persons." Investigation as a precedent to action is not exclusively an attribute of a judicial proceeding. Counsel confounds the usual legislative inquiry which precedes the passage of laws with the judicial consideration of a controversy in a court of justice. It certainly would not be claimed that the hearing and consideration by committees of legislative bodies of the views and opinions of men having special knowledge of matters to be affected by proposed legislation constitute in any sense the exercise of judicial functions, or that such committees are judicial tribunals. Nor does it follow that, because the exercise of the powers conferred upon the court of visitation requires the use of judgment and discretion, such powers are judicial in their nature, as that would make every executive act and legislative act requiring judgment and discretion a judicial act. To

use the language of the supreme court of Kansas in The Auditor v. Railroad Co., 6 Kan. 509:

"It certainly could not be so in the sense in which our constitution uses the term, or it would, of necessity, obliterate the lines by which the framers of that instrument sought to keep separate and distinct the three branches of our government."

As was said in Re Huron, 58 Kan. 156, 48 Pac. 576, 36 L. R. A. 824:

"Not every one who hears testimony and exercises discretion and judgment in a matter submitted to him is necessarily a judicial officer."

Counsel say:

"The decision of a question which may arise between different railroad companies as to how much of a certain charge each shall have is as much a judicial function as to decide how much of an estate each of the heirs shall receive."

That may be true where there is such a controversy pending in a court between the railroad companies themselves, but that is not the sense in which the power is conferred upon the court of visitation. The intent of the act of the legislature was, not to authorize the adjudication of distinct controversies of that character between contending railroad companies, but, instead thereof, the laying down of a rule in behalf of the state and the public, and the securing of the future obedience thereto by the imposition of fine and imprisonment. Is not that process legislation, and is not the result a regulation or a law?

The fact that the legislature denominated the tribunal a court is not conclusive as to its true character, nor as to the nature of the jurisdiction and powers conferred upon it. That question is not determined by the terminology employed in the act, although the legislative purpose and intent may be evidenced thereby, but it is determined rather by the ascertainment of the essential nature of the jurisdiction and powers themselves. The constitution of the state of Kansas authorizes the creation of courts inferior to the supreme court by act of the legislature, and, by necessary implication, the defining of the jurisdiction of the courts so created. Article 3, § 1. Nevertheless such jurisdiction must, in all essential particulars, be judicial in its character, and the constitutional authority for other courts than those specifically named in the constitution must be so construed and limited. Under the constitution, the legislature may not create a court for the exercise of its own legislative functions, or for the performance of purely administrative or executive duties; and though a tribunal, as constituted by legislative act, may be denominated a court, may possess a seal, and be clothed with the usual and customary vesture of a judicial tribunal, yet its real character is determined by its jurisdiction and the functions it is empowered to exercise. The legislature may create a court of visitation, but it can only be a court in respect of matters of a judicial nature, and such as are properly incidental thereto. It is clear, however, that it was the intention of the legislature in the enactment of the law to confer certain judicial powers upon the court of visitation in respect of the same matters over which that court was authorized to exercise legislative and administrative functions. It was clearly the legislative

intent to confer upon the court of visitation not only the power to prescribe rules and regulations for the government of railroad and telegraph companies in their relations to the public and to each other, but also the power to pass judicially upon the validity of such rules and regulations, to render judgment accordingly, and full power to execute their orders and judgments. By the language of the act under consideration, the court of visitation can prescribe a tariff of rates and charges, judicially determine the reasonableness thereof, and then enforce their judicial determinations in as radical and complete a method as could be devised. Concisely stated, the court of visitation may make laws, sit judicially upon their own acts, and then enforce their enactments which have received their judicial sanction. Can this be done? Can there be vested in one body such a union of powers of the different departments or branches of government, to be exercised respecting the same subject-matter and in the same proceeding? Counsel for defendants contend that in cases where "the duties of the departments are so intermingled and interwoven that it is difficult to determine to which department they belong, and it is absolutely necessary for the administration of justice that the duties of one be performed by the officers of the other, * * * it is within the power of the legislature—and its duty—to provide that the officers of one department shall perform the duties of another; and where this is done, and there is no express prohibition in the constitution against it, it is certainly valid."

Counsel also contend that there is no provision of the constitution of the state of Kansas inhibiting the commingling of legislative, judicial, and executive powers, and the conferring by the legislature of the functions of one department upon the other. If this were in fact the case, the language of Chief Justice Marshall in Fletcher v. Peck, 6 Cranch, 136, 3 L. Ed. 162, would be significant. He said:

"It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power, and, if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation? To the legislature all legislative power is granted; but the question whether the act of transferring the property of an individual to the public be in the nature of the legislative power is well worthy of serious reflection. It is the peculiar province of the legislature to prescribe general rules for the government of society. The application of those rules to individuals in society would seem to be the duty of other departments. How far the power of giving the law may involve every other power in cases where the constitution is silent, never has been, and perhaps never can be, definitely stated."

But there is no such omission in the constitution of Kansas. It provides as follows:

Article 1, § 1: "The executive department shall consist of a governor, lieutenant governor, secretary of state, auditor, treasurer, attorney general and superintendent of public instruction," etc. Article 2, § 1: "The legislative power of this state shall be vested in a house of representatives and senate." Article 3, § 1: "The judicial power of this state shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts inferior to the supreme court as may be provided by law," etc.

That, in a broad sense, the powers of one of these departments shall not be conferred upon either of the others, is not only within the

true spirit of these provisions, but also substantially within the letter thereof; and the addition thereto of an express prohibitory declaration, such as is contained in the constitutions of some of the states, that the powers of one department shall not be exercised by another, would add very little to their effect, so far as concerns the question under consideration. The universal doctrine of American liberty under written constitutions requires the distribution of all the powers of government among three departments,—legislative, judicial, and executive,—and that each, within its appropriate sphere, be supreme, co-ordinate with, and independent of, both the others. This doctrine was adopted into the constitution of one state with the declaration that it was "to the end it may be a government of laws, and not of men." The attendant danger of the encroachment by one department upon the constitutional province of the other is fully as apparent at the present time as when Mr. Madison wrote the forty-sixth and forty-seventh numbers of the Federalist. Justice Miller said, in Kilbourn v. Thompson, 103 U. S. 191, 26 L. Ed. 387:

"It may be said that these are truisms that need no repetition here to give them force. But, while the experience of almost a century has shown a wise and commendable forbearance in each of these branches from encroachments upon the others, it is not to be denied that such attempts have been made, and, it is believed, not always without success. The increase in the number of states, in their population and wealth, and in the amount of power, if not in its nature to be exercised by the federal government, presents powerful and growing temptations to those to whom that exercise is intrusted to overstep the just boundaries of their own department, and enter upon the domain of one of the others, or to assume powers not intrusted to either of them."

There is a full accord among elementary writers and publicists who treat of the growth and development of the principles of an enlightened government and the relations between the state and the individual. Dr. Paley says:

"The first maxim of a free state is that the laws be made by one set of men and administered by another; in other words, that the legislative and judicial characters be kept separate." Moral Philosophy, bk. 6, c. 8.

Blackstone says:

"In this distinct and separate existence of the judicial power in a peculiar body of men, nominated, indeed, but not removable at pleasure, by the crown, consists one main preservative of the public liberty, which cannot subsist long in any state unless the administration of common justice be in some degree separated both from the legislative and also from the executive power. Were it joined with the legislative, the life, liberty, and property of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law, which, though legislators may depart from, yet judges are bound to observe. Were it joined with the executive, this union might soon be an overbalance for the legislative." 1 Bl. Comm. 269.

Baron Montesquieu writes:

"When the legislative and executive powers are united in the same person, or the same body of magistrates, there can be no liberty, because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner. Again, there is no liberty of the judiciary power if it be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be the legislator. Were it joined to the executive power, the judge might behave with violence and

oppression. There would be an end of everything were the same man, or the same body, whether of nobles or of the people, to exercise these three powers,·—that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals." Spirit of Laws, bk. 11, c. 6.

It is true that this is ancient doctrine, but it serves no ill purpose to renew familiarity therewith, especially in times when it is claimed that the complexity of commercial affairs affords sufficient cause to either undermine or openly destroy those safeguards that are deemed so essential to the permanency of a free government.

In the distribution of the powers of government between the three departments the federal constitution is as general in its provisions as that of the state of Kansas. There is the same absence of any positive and specific prohibition against the conferring of the powers of the one upon the other. In Kilbourn v. Thompson, supra, it was said:

"It is believed to be one of the chief merits of the American system of written constitutional law that all the powers intrusted to government, whether state or national, are divided into the three grand departments, the executive, the legislative, and the judicial; that the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall, by the law of its creation, be limited to the exercise of the powers appropriated to its own department, and no other. * * * In the main, however, that instrument, the model on which are constructed the fundamental laws of the states, has blocked out with singular precision, and in bold lines, in its three primary articles, the allotment of power to the executive, the legislative, and the judicial departments of government. It also remains true, as a general rule, that the powers confided by the constitution to one of these departments cannot be exercised by another. * * * The constitution declares that the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may, from time to time, ordain and establish. If what we have said of the division of the powers of the government among the three departments be sound, this is equivalent to a declaration that no judicial power is vested in the congress, or either branch of it, save in the cases specifically enumerated to which we have referred."

In Dash v. Van Kleeck, 7 Johns. 477, one of the questions involved was whether a legislative act could be retrospective in its operation, and amount to a legislative interpretation of a pre-existing law, thus in effect combining the exercise of legislative and judicial functions in the passing of the act. Kent, C. J., said:

"It is equally inadmissible to consider the act as declaring how the former statutes were to be construed as to cases already existing. If this interpretation was to be considered as giving the former acts a new meaning, it then becomes a new rule, and is to have the same effect as any other newly-created statute. But, if it be considered as an exposition of the former acts for the information and government of the courts in the decision of causes before them, it would then be taking cognizance of a judicial question. This could not possibly have been the meaning of the act, for the power that makes is not the power to construe a law. It is a well-settled axiom that the union of these two powers is tyranny. Theorists and practical statesmen concur in this opinion. * * * And, if it be not found in our own constitution in terms, it exists there, in substance, in the organization and distribution of the powers of the departments, and in the declaration that the 'supreme legislative power' shall be vested in the senate and assembly. No maxim has been more universally

received and cherished as a vital principle of freedom. And without having recourse to the authority of elementary writers, or to the popular conventions of Europe, we have a most commanding authority in the sense of the American people that the right to interpret law does and ought to belong exclusively to the courts of justice."

The decisions of the supreme court of Kansas upon the interpretation of the fundamental law of the state in regard to this question and the application thereof to legislative enactments are to the same effect, and in such matters they are binding upon this court.

In re Huron, 58 Kan. 152, 48 Pac. 574, 36 L. R. A. 822. This case involved the constitutionality of an act of the legislature conferring upon notaries public the power to commit witnesses for contempt. It was held that, although the taking of testimony is incidental to a judicial proceeding, that duty, as well as the other ordinary duties of such officer, were not judicial in their character, and that the legislature could not lawfully confer upon him the judicial power to attach and punish as for a contempt. The court said that:

"Up to the time of the refusal of the witness, at least, the notary is only an executive officer, and is exercising executive power. There is no such thing as a punishable contempt of executive authority. While an executive officer might be constituted a court, judicial power cannot be conferred on him as merely ancillary to the exercise of purely executive power."

In re Sims, 54 Kan. 1, 37 Pac. 135, 25 L. R. A. 110. There is a decided analogy between this case and the case at bar. The legislature of the state of Kansas enacted a law in aid of the enforcement of the prohibitory liquor law, making it the duty of the county attorney, when informed of any violation of the prohibitory law, to subpoena witnesses to appear before him, to swear such witnesses, examine them, and reduce their testimony to writing; and authorizing him to punish any witness for contempt in disobeying his process or in refusing to answer questions. If the examination disclosed that an offense had been committed, the county attorney was required to proceed with the prosecution of the offender. The law was attacked as being unconstitutional in that it was an attempt to confer judicial power upon an executive officer in respect of matters pertaining to his executive functions. The opinion of the court was delivered by Justice Allen. Separate concurring opinions were delivered by the other justices. In the opinion of the court it is said:

"The single question presented for our consideration is whether that portion of the statute which authorizes the county attorney to punish as for contempt is in violation of the constitution of this state. Nothing is more firmly fixed in the governmental systems of all English-speaking countries than the division of powers between the three great departments of government, the executive, legislative, and judicial. The question before us is whether the legislature has power to confer on an executive officer charged with the duty of searching out violations of the law, inquiring into facts, instituting and carrying on prosecutions for violations of the criminal laws of the state, the power, at the same time, and as ancillary to the performance of his duties as a prosecuting officer, to commit persons to jail as for a contempt of his authority. * * * It is sought to distinguish the case before us from those cited because of provisions in the constitutions of Wisconsin and Indiana with reference to the separation of executive and judicial powers. We think, however, that in our constitution these powers are as clearly separated as though the framers of the constitution had said so in terms. It needs but a suggestion to show that the combination of executive and judicial powers may become tyranny at once.

The advancement in the science of government made in modern times is due to the separation of the three great co-ordinate departments. If the legislature may confer on the county attorney one of the highest and most distinctive attributes of judicial power—that of punishing for contempt—to aid him in ascertaining from witnesses the facts with reference to violations of law, might the legislature not also confer on any attorney the power to examine witnesses in civil cases in the same manner, and to commit them for contempt if they refuse to answer his questions? Might it not also give to any executive officer from the governor down the power to subpœna witnesses to inform his judgment, and to aid him in any executive decision or determination? And, if the rule is established, can it be doubted that the division between executive and judicial offices will be completely broken down, and all constitutional barriers removed from those forms of oppression which have always attended this combination? * * * This is a commingling and confusing of executive and judicial functions in a manner incompatible with the constitution, obnoxious to its whole spirit and to the spirit of free institutions, and the act to that extent is void."

Johnson, J., after referring to the extent to which there may be an admixture of the functions of the three great governmental departments, says:

"No case has been sustained, however, where the new duties conferred upon an officer were incompatible with those already imposed by such office. * * * It is not within the power of the legislature to make a judge an arbiter in his own cause; and to give an attorney for one of two adverse parties the power to determine the controversy is wholly inconsistent with our system of jurisprudence."

The Auditor v. Railroad Co., 6 Kan. 500. In this case the act of the legislature under consideration provided that the county clerks of the various counties in which any railroad company had its tracks should constitute a board of assessors for the purpose of assessing the property of the company for purposes of taxation. It also provided for an appeal to the supreme court of the state from the assessment returned to the state auditor. It was contended by the railroad company that the raising of money for the support of the government, and, to that end, taxation, including the preliminary assessment, was purely a legislative power, and that the provision authorizing the appeal was an attempt to confer legislative functions upon a judicial tribunal. The supreme court of Kansas so held, and used the following language with reference to the legislative and judicial departments of the government:

"The two are separate and distinct departments of government, each having its appropriate sphere of action, and each clothed with powers to execute the duties pertaining to its own functions; and when each confines itself within the sphere of its constitutional power there is less danger of that peril pointed out by an eminent jurist when he says, in reference to this matter: 'There is an inherent and eternal difficulty in confining power of any kind within its proper limits. This general rule holds eminently true in regard to legislative and judicial bodies.'"

In some cases the courts have declined to exercise functions not judicial in their character, which were imposed upon them by legislative act. The judges of the circuit court of the United States for the district of Pennsylvania held they could not constitutionally perform duties imposed by an act of congress passed February 28, 1793, regulating, among other things, claims to invalid pensions, for the reason that the decisions of the courts under the act were subjected to con-

sideration and suspension by the secretary of war, and then to the revision of the legislature. The judges of the circuit court for the district of New York, while holding that the power of the secretary of war and of the legislative department over the decision of the court showed that their action under the law was not of a judicial character, nevertheless proceeded to act as commissioners, and not as a court. The judges of the circuit court for the district of North Carolina held that they could not act judicially under the law, but reserved their decision as to whether they could act as commissioners. The supreme court afterwards held that the judges could not act as commissioners. U. S. v. Ferreira, 13 How. 40, 14 L. Ed. 42, and note thereto. In other cases, imposed duties, not judicial in their nature, have been performed with a declaration on the part of the judges as to their true character. Thus, by a recent act of the legislature of the state of Kansas relating to the compilation of the General Statutes of 1897, it was provided that the work of the compiler should be examined by the justices of the supreme court, who should ascertain whether it contained all laws of a general nature then in force, etc., and, if so found, should certify such fact to the secretary of state. The learned justices made the certificate, but stated therein that they deemed it a task which the legislature could not lawfully impose on them. 1 Gen. St. Kan. p. 7. It is true that there are instances where judicial powers are exercised by executive officers and by legislative bodies, and also where courts perform functions that are not judicial in their character, but are of an administrative nature; but this admixture of different powers and duties, where it has been upheld, is, in most cases, no more than is necessary to preserve the relation of the departments to each other, and no more than was contemplated by the constitution of New Hampshire, adopted in 1784, which declares that the three essential powers of government "ought to be kept as separate from and independent of each other as the nature of a free government will admit, or as is consistent with the chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity." A division of powers in a general view is what is meant, as is pointed out by Mr. Justice Story. The departments are politically connected, and to some extent they are interdependent, but their functions, being essentially different, are not blended, nor do they occupy a common ground, or exercise concurrent jurisdiction over the same subject-matter.

The legislature cannot enact what the decision shall be in any controversy whereof the jurisdiction of a court has been invoked, nor give validity to a void judgment, nor grant a new trial of an action before a court, nor authorize an appeal by special provision. Its acts, generally speaking, are prospective in their operation, while the jurisdiction of courts is exercised upon past or existing conditions. It is not a proper judicial function to engage in the determination of the validity of contemplated legislative action, or in advance of a controversy arising thereunder, nor to undertake a collaboration with legislative or administrative bodies in the formulation of a schedule of reasonable rates to be charged by public service corporations. Excepting in three or four of the states, the constitutions of which spe-

cifically so provide, courts do not venture an opinion upon legislative enactments until they have come complete from the hands of the legislature, and the application or interpretation thereof properly arises in pending controversies; and in the states where the exception obtains the courts act only upon express invitation, and on most solemn occasions. The act of the legislature creating the court of visitation and defining the powers and duties thereof seems to me to be well within the decisions of the supreme court of Kansas which hold as unconstitutional the conferring of distinct legislative or executive powers and judicial powers upon the same officer, board, or body, especially where the exercise of one of such powers is not merely incidental to the other, but where each is substantial in its character, and relates to the same general subject-matter, and is, therefore, inconsistent with the other. Following the decisions of the highest court in the state, I am therefore constrained to hold that the act of the legislature is violative of the provisions of the constitution of the state of Kansas. Whether the act is, in its entirety, repugnant to the state constitution, or is but partly so, and whether, if the latter is the case, the valid portion of the act may be allowed to stand and be operative as a law, will be adverted to hereafter. The allegations of the bill and the proofs at the hearing show prima facie that the telegraphic rates prescribed by the legislature are unreasonable and confiscatory in that they are less than the cost of performing the service. Their enforcement by the defendants would, therefore, be violative of the first section of the fourteenth amendment to the constitution. It also appears that steps have been taken by the defendants for the enforcement of those rates, as the information filed against the complainant in the court of visitation and the subsequent proceedings show, and that many actions have been commenced in the state courts to recover the penalties imposed by the act relating to telegraph companies. Sufficient appears to show that this court has acquired jurisdiction, and in such case the determination of any question that properly arises cannot be avoided. In Smyth v. Ames, supra, it was said that "a party by going into a national court does not lose any right or appropriate remedy of which he might have availed himself in the courts of the same locality." Although the opportunity should never be sought by a federal court, yet in a cause properly brought and pending therein that court has the right, and it is its duty, if the question arises, to test the validity of an enactment of a state legislature by the provisions of the state constitution as well as by the limitations of the federal constitution. The responsibility of decision as to the former is greatly lessened, however, if the highest court in the state has practically determined the question by its interpretation of the state constitution as applied to analogous cases. Although the act creating the court of visitation may be, for the reasons stated, violative of the constitution of the state in so far as it attempts to confer upon that body judicial powers in respect of the same matters whereof it is given legislative and administrative jurisdiction, it is another question whether the act is in any particular in contravention of the constitution of the United States.

In view of what has been said of the court of visitation and the nature of the various powers conferred upon it, would a judicial proceeding before said court to determine the reasonableness of a body of rates be due process of law, within the meaning of the first section of the fourteenth amendment to the constitution? Due process of law in judicial proceedings means a course of legal proceedings according to those rules and principles which have been established in our system of jurisprudence for the protection and enforcement of private rights. In legislative proceedings it requires a conformity to the settled maxims of a free government, and an observance of constitutional restraints and requirements. In either case it means that there should be an omission to exercise substantial powers appertaining to the other department. Courts cannot legislate and pass judgment thereon. Legislative bodies, or boards that are constituted as legislative agencies, cannot render judgment upon their legislative acts. In either case neither the proceeding nor the result would be due process of law. In the Sims Case, supra, Johnson, J., said, with reference to the conferring of power upon a county attorney to punish a witness for contempt in a proceeding before him under the prohibitory liquor law, that it was not within the power of the legislature to make a judge an arbiter in his own cause, and that to give an attorney for one of two adverse parties the power to determine the controversy is wholly inconsistent with our system of jurisprudence. In that case a county attorney was recognized as being the representative of the state. In the case under consideration it seems clear, not that the members of the court of visitation are representative executive officers of the state, but that they are the direct and active representatives of the legislative department. It would certainly be as inconsistent with our system of jurisprudence to empower them to act judicially in matters whereof they had legislative or administrative cognizance as it would be to confer judicial powers upon an executive officer. Judge Cooley says:

"If the legislature is intrusted with apportioning and providing for the exercise of judicial power, we cannot understand them to be authorized, in the execution of this trust, to do that which has never been recognized, as being within the province of the judicial authority. To empower one party to a controversy to decide it for himself is not within the legislative authority, because it is not the establishment of any rule of action or decision, but it is a placing of the other party, so far as that controversy is concerned, out of the protection of the law, and submitting him to the control of one whose interest it will be to decide arbitrarily and unjustly." Const. Lim. 413.

That the important powers of government differing so widely in their essential characters might lawfully be vested in a single board or tribunal, to be exercised upon the life, liberty, or property of a person, is a startling proposition, and it would suggest the inquiry whether our plan of government has not insensibly drifted far away from its ancient moorings. Chief Justice Shaw said, in Com. v. Essex Co., 13 Gray, 239, 253, "Extreme cases are allowable to test a legal principle." Suppose the legislature should repeal the crimes and punishment act of the state of Kansas, and, the state constitution not inhibiting, should delegate to some board or body, or, for that matter, to a single person, the power to formulate new laws, to con-

strue and apply the same as a court, and to execute their judgments, would this be due process of law, under the federal constitution? I think not, and for the reason that it would be repugnant to the underlying, vital principles of our government, state and national. It would not be justice as it is understood of men. The results would comprise legislative judgments and judicial legislation. The protection of the fourteenth amendment to the constitution is not confined to life and liberty, but extends to and includes as well the property of a person. A corporation is held to be a person within the meaning of its provisions. I am therefore of the opinion that a proceeding before the court of visitation, in which it is sought to secure a judgment upon the reasonableness of a body of rates prescribed by it to be charged by a railroad or a telegraph company, would not be due process of law within the meaning of the federal constitution.

It is contended on behalf of defendants that by this suit the complainant is attempting to enjoin a proceeding pending in a state court, contrary to the provisions of section 720 of the Revised Statutes, prohibiting the granting of the writ of injunction by any court of the United States to stay proceedings in any court of a state except where authorized in proceedings in bankruptcy. The error in this contention lies in the fact that it involves an assumption that the court of visitation is a court within the meaning of the section mentioned, whereas whether it is a court or not is one of the vital questions raised for determination in this case. It cannot be said that, because a board or tribunal is denominated a court by the law creating it, all inquiry as to its true character is precluded, and that it must be conclusively assumed to be a court, whether rightly so or not. In Railway Co. v. Dey (C. C.) 35 Fed. 866, 871, 1 L. R. A. 744, it was contended that the suit was against the state, and therefore within the inhibition of the eleventh amendment to the constitution. Upon this point Mr. Justice Brewer, then circuit judge, said:

"The defendants claim that they are simply attempting to carry into effect the mandates of the state as expressed in one of its laws; but, if that law be unconstitutional, it is no law, and they have no authority for their actions. This proceeding is a judicial inquiry to see whether they have authority for their actions; whether the law upon which they rely is valid and constitutional, or sufficient to justify the actions which they are taking."

With the qualification that the federal courts "follow the decisions of the highest court of a state in construing the laws of the state, unless they conflict with or impair the efficiency of some principle of the federal constitution or of a federal statute, or a rule of commercial or general law," the true nature of a tribunal created, as well as the true interpretation and effect of the law of the state creating it, is always open to inquiry in a proper proceeding, and the jurisdiction of a court of the United States may not be denied because of an erroneous or unconstitutional assertion making to the contrary.

In Norton v. Shelby Co., 118 U. S. 425, 442, 6 Sup. Ct. 1121, 1125, 30 L. Ed. 178, 186, it was contended that a legislative act, though unconstitutional, may, in terms, create an office, and nothing further than its apparent existence is necessary to give validity to the acts of its assumed incumbent. The court said:

"That position, although not stated in this broad form, amounts to nothing else. It is difficult to meet it by any argument beyond this statement: an unconstitutional act is not a law. It confers no rights. It imposes no duties. It affords no protection. It creates no office. It is, in legal contemplation, as inoperative as though it had never been passed."

It is also contended by the defendants that this suit cannot be maintained because it is, in effect, an action against the state of Kansas, and therefore within the provisions of the eleventh amendment to the federal constitution; also that it is an effort to determine the constitutionality of a state enactment by the injunctive process of a federal court. In support of these contentions the case of Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, is principally relied on. In that case the suit, which was for an injunction, was originally instituted in the circuit court of the United States for the Northern district of Alabama against the state of Alabama, William C. Oates as governor, and William C. Fitts as attorney general, of that state. The purpose of the suit was to prevent the enforcement of an act of the general assembly of Alabama prescribing maximum rates of toll to be charged on a certain bridge, which were alleged by complainants to be unreasonable and confiscatory, and to amount to a deprivation of complainants of their property without due process of law, etc. The act also prescribed certain penalties for failure to observe it, and it was alleged that various indictments were found against them, and that other proceedings were threatened. Subsequent to the filing of the original bill of complaint, A. H. Carmichael, the regular local prosecuting officer of the state, was made a party defendant. The complainants dismissed the cause as to the state, and it was afterwards discontinued as to Oates, who ceased to be governor. Trial was had as to the others, and a perpetual injunction was awarded against the attorney general and local prosecuting officer. On appeal to the supreme court it was held that the suit was, in effect, one against the state, and was, therefore, not maintainable. The supreme court said:

"What is and what is not a suit against a state has so frequently been the subject of consideration by this court that nothing of importance remains to be suggested on either side of that question. It is only necessary to ascertain, in each case as it arises, whether it falls on one side or the other of the line marked out by our former decisions. We are of the opinion that the present case comes within the principles announced in Re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216."

After explaining the scope of the decision in the Ayers Case and of other cases upon which it was based, the court further said:

"But this is not intended in any way to impinge upon the principle which justifies suits against individual defendants, who, under color of the authority of unconstitutional legislation by the state, are guilty of personal trespasses and wrongs; nor to forbid suits against officers in their official capacity, either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest. * * * It is to be observed that neither the attorney general of Alabama nor the solicitor of the Eleventh judicial circuit of the state appears to have been charged by law with any special duty in connection with the act of February 9, 1895. In support of the contention that the present suit is not one against the state, reference was made by counsel to several cases, among

which were Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185; Allen v. Railroad Co., 114 U. S. 311, 5 Sup. Ct. 925, 962, 29 L. Ed. 200; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689; Reagan v. Trust Co., 154 U. S. 362, 388, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632; and Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. Upon examination it will be found that the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing, or were about to commit, some specific wrong or trespass, to the injury of the plaintiff's rights. There is a wide difference between a suit against individuals holding official positions under a state to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement."

It seems to me to be clear that the doctrine announced in Smyth v. Ames and the preceding cases to the same effect was not modified by the decision in Fitts v. McGhee, and that it is also clear that the case at bar is not a suit against the state of Kansas, within the meaning of the eleventh amendment to the constitution. It will be noticed that in the case at bar the defendants, excepting Maxwell, who is not an officer, are specially charged with the enforcement of the state enactments under consideration, and that they are not otherwise general officers of the state, or charged with the enforcement of all laws generally.

While it is true that ordinarily a suit in equity for an injunction will not lie merely to test the constitutionality of a legislative enactment, it is for the reason that the party has an adequate remedy at law by setting up the alleged defect or unconstitutionality as a defense to any action or proceeding involving the application of the law in question. But it is also well-settled doctrine that, if the established principles and rules of equity as administered in the federal courts, applied to the facts in any case, entitle a party to sue in such a forum, and to obtain therein the process of injunction, when such a suit is brought the court has the undoubted right, as appurtenant to the exercise of the jurisdiction thus obtained, to determine the constitutionality of a state law, and, if the determination is against the validity of the law, to enjoin the enforcement thereof. This suit is within the doctrine announced by Mr. Justice Miller in Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970, approved in Railway Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, and applied in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

It is also contended that the rates for telegraphic service are not made absolute by the act, and are not binding upon the court of visitation, and that the telegraph company has no cause for complaint, at least until the court of visitation has acted. In Smyth v. Ames, supra, the act of the legislature prescribed what was termed the "Nebraska Schedule of Reasonable Maximum Rates," and it delegated

to the board of transportation, a body previously organized under the laws of that state, consisting of certain general state officers, among whom were the attorney general, secretary of state, and state treasurer, the power to reduce the rates on any class or commodity in the schedule of rates fixed in the act whenever to do so seemed just and reasonable to a majority of the board; but it was specifically provided that no change should ever be made by the board so that the rates on any freight would become higher or greater than as fixed by the act. The circuit court of the United States for the district of Nebraska, Mr. Justice Brewer presiding, enjoined the members of the board of transportation and the railroad companies from enforcing or putting into effect the rates prescribed by the act of the legislature, and the decree was affirmed by the supreme court. It will be observed that the situation in that case is analogous to the case at bar. It is provided by section 1 of the Kansas act for the regulation of telegraph companies that the court of visitation is given jurisdiction and control of all questions relating to the reasonableness of the charges fixed in the second section of that act, or to be fixed by any order of that court. In so far as it authorizes a reduction of the maximum rates fixed in the act itself, the case is precisely like that of Smyth v. Ames. In so far as it authorizes the court of visitation to raise the rates fixed in the statutory schedule, it was the evident purpose of the legislature that the rates could not be raised unless that body, in the exercise of proper judicial functions, adjudged and decreed that those prescribed by the legislature were unreasonable and noncompensatory. It cannot be said that it was the legislative purpose to prescribe a mere tentative schedule of rates that could be either observed or ignored at the will of an administrative body without the exercise of judicial powers in the determination of their reasonableness. The court of visitation possessing no power to determine the reasonableness of the rates prescribed in the act, the case stands as though the schedule prescribed was that of maximum telegraphic rates, and therefore it is in the same situation as the case of Smyth v. Ames.

If it is not within the constitutional province of the legislature to confer upon the court of visitation the power to prescribe a schedule of rates and charges, and also the jurisdiction to determine judicially the validity and reasonableness thereof, and to execute its judgment embodying such determination by sequestration of the property of those upon whom the law operates, what, then, becomes of the statute establishing the court? Is it absolutely void, or may it be sustained in part by the elimination of the features which render it unconstitutional? The universal rule of statutory construction is that a part of an act may, under certain circumstances, be valid without affecting the validity of the remainder, and any independent provision or body of provisions may be dropped out if that which is left is fully operative as a law, unless it is evident from a consideration of the entire act that the legislature would not have enacted that which is within independently of that beyond its power. The valid part, however, must not only be complete in itself, but also in accord with the legislative purpose. It is clear that

those parts of the statute under consideration which confer legislative and administrative functions upon the court of visitation cannot be eliminated, leaving the remainder to stand, for it is apparent that there would be very little for a judicial jurisdiction of the court of visitation to operate upon.

In seeking the purpose and intent of the legislature the inquiry need not be confined to the act itself, but consideration may be given to other statutes, especially those which were passed at the same legislative session, and about the same time. But a few days after the passage of the act creating the court of visitation, the legislature repealed the law which had then been in force for many years establishing and defining the duties and powers of the board of railroad commissioners, which was a board exercising purely administrative duties in aid of and supplementary to the legislative prerogative of fixing rates and the general regulation of railroad service. The powers of the board of railroad commissioners had been previously conferred upon the court of visitation. The repealing act, and the act creating the court of visitation, together with the act relating to telegraph companies, were all enacted at the same session, and about the same time. They are to be construed as in pari materia, as composing one body of legislation upon cognate subjects, in order to ascertain the legislative intent. There are grounds, therefore, for claiming that the legislature did not intend to wipe out of existence every board possessing the powers of the former board of railroad commissioners; that the judicial powers attempted to be conferred upon the court of visitation might be dropped out, leaving the remainder of the act to stand, and be operative as a law. As to such a claim it may be said that a board which possesses no judicial powers, but whose powers are entirely legislative or administrative, is styled a court, is without significance. Judicial powers may be conferred without designating the recipient a court. Legislative powers may be delegated and administrative powers conferred, and the recipient may be denominated a court. In neither case does the terminology employed govern, but courts look behind the form and appearance, and determine the character of the board or tribunal by the substance of its jurisdiction and powers. That the act establishing the court of visitation is either wholly void, or void to the extent that it attempts to confer judicial powers upon that body, I have no doubt. It is unnecessary to determine, in this case, whether the court of visitation, though possessing no judicial functions, may still have and exercise the legislative and administrative powers specified in the acts of the legislature.

The conclusions arrived at are substantially as follows:

1. That the proofs adduced in this cause show prima facie that the maximum rates for telegraphic service prescribed by chapter 38 of the laws enacted by the legislature of the state of Kansas at the special session of 1898 are less than the cost of performing the service, and are, therefore, unreasonable, and confiscatory; and that the enforcement of such rates, which is threatened, would operate to deprive the telegraph company of its property without due process of law, and would be a denial of the equal protection of the laws.

2. That in the enactment of the law creating the court of visitation of the state of Kansas and defining its powers and jurisdiction, and of the subsequent law extending such powers and jurisdiction to telegraph companies, the legislature attempted to confer upon a single board or body important and substantial legislative, administrative, and judicial powers, to be exercised in the same proceeding, and as to the same subject-matter. It attempted to confer full power to regulate the operation of railroad and telegraph companies, and to prescribe schedules of rates and charges, which power is legislative or administrative in its character. It also attempted to confer upon the court of visitation the power to pass judicially upon its regulations, and the reasonableness of the rates fixed by it, to embody its determinations in decrees, which it was authorized to enforce by the appointment of receivers and the sequestration of the property of the companies.

3. The distinction between legislative and judicial functions is a vital one, and it is not subject to change or impairment either by legislative act or by judicial decree, for such distinction inheres in the constitution itself, and is as much a part of it as though it were definitely defined therein. When the legislature has once acted, either by itself or through some subordinate board or agency, and has prescribed a tariff of rates and charges, then whether its action is violative of some constitutional safeguard or limitation is a judicial question, the determination of which involves the exercise of judicial functions. The question is then beyond the province of legislative jurisdiction.

4. That the law creating the court of visitation is in contravention of the constitution of the state of Kansas, which inhibits the conferring of inconsistent legislative and judicial powers upon the same body, to be exercised regarding the same subject-matter.

5. That a proceeding in the court of visitation to determine judicially the validity and reasonableness of a body of rates established by it in the exercise of its legislative functions is not due process of law, within the meaning of the fourteenth amendment to the federal constitution. An active, potential agency of the legislative power of a state cannot be empowered to sit in judgment upon the validity of its own enactments, and to enforce its decrees with reference thereto by the exercise of the extraordinary powers of a court of chancery.

6. The act of the legislature creating the court of visitation and the act extending the powers and jurisdiction thereof to telegraph companies cast upon the officials who are defendants in this suit the special duty of administering and enforcing said laws. Their offices were created solely for such purposes, and such defendants are not general officers of the state, whose duty it is to see to the enforcement of laws generally, and who act only by formal judicial proceedings in the courts of the state. This suit, therefore, is not against the state of Kansas, and hence is not within the prohibition of the eleventh amendment to the constitution of the United States.

7. Whenever it is claimed that the purpose and effect of a writ of injunction granted by a court of the United States is to stay pro-

ceedings in a court of a state, it is competent for the former court to ascertain and determine whether the board or body created by the laws of the state, and before whom the proceedings sought to be enjoined are pending, is in fact and in law a court. The jurisdiction of a court of the United States cannot be denied by an unconstitutional enactment of a state legislature, nor by an erroneous use of terms therein. The court of visitation of the state of Kansas cannot lawfully exercise judicial functions, nor is it a court within the meaning of section 720 of the Revised Statutes of the United States.

The application for a temporary injunction will be granted.